## HOLT et al. v. AETNA BLDG. & LOAN ASS'N.

No. 7428—Opinion Filed June 8, 1920.

(Syllabus by the Court.)

**1. Building and Loan Associations—For-
eign Companies—Rights and Powers.**

By virtue of section 44, art. 9 (sec. 261,
Wms'. Ed.), Constitution, a foreign building
and loan association cannot exercise in this
state any greater or different rights, powers,
and privileges than are conferred on similar
domestic corporations.

**2. Corporations — Foreign Corporations —
Comity—Rights and Powers—Contracts.**

The rule of comity does not require that
foreign corporations be allowed to enforce
contracts in conflict with the laws of this
state, or the enforcement of which would
give to the citizens of another state an ad-
vantage which a resident of this state would
not have.

**3. Building and Loan Associations—For-
eign Companies—Rights and Powers—
Contracts.**

For a foreign corporation to be entitled
to exercise the rights, powers, and privi-
leges accorded building and loan associa-
tions under article 16, secs. 1487-1532, Comp.
Laws 1909, and to enforce contracts entered
into by it with citizens of this state in the
courts of this state, it must clearly appear
that it is being operated in compliance with
the laws of this state pertaining to such as-
sociations and that the business conducted
by it is in keeping with the purposes and
aims of such associations as defined by these
laws, and that the character of its business
is in keeping with that permitted to be con-
ducted by domestic building and loan asso-
ciations.

**4. Same—Statutes Controlling—Rights of
Borrowing Members.**

Under the laws of this state pertaining
to building and loan associations at the
time of the transaction herein involved, mu-
tuality was required, and the borrowing
members were entitled to share equally in
the profits with the non-borrowing members,
and they cannot be required to bear more
than their proportionate amount of the
losses and expenses of the association.

**5. Usury— Question of Fact—Collateral In-
struments.**

Where a contract is apparently fair on
its face and the interest reserved thereby,
as disclosed by the terms of the instrument
sued on, is within the legal limit, but the
claim is made that usury was in fact re-
tained and that such usurious charge is
evidenced by other collateral instruments or
by some agreement or device intended as a
cloak for such usurious transaction, it then
becomes a question of fact as to whether
there was a usurious charge made by such

collateral instruments or by such agreement or device, and in such case the intent of the parties at the time the contract was entered into is a question to be determined from all the facts and circumstances in the case.

### 6. Interest—Legal Rate—Effect of Setting Aside Contract Rate.

Where an attempted contract as to the rate of interest is set aside, interest should be allowed at the legal rate of six per cent. per annum.

### 7. Building and Loan Associations—Foreign Company — Rights and Powers — Construction of Contract.

Evidence examined, and held: That upon the facts stated in the case plaintiff's loan was not a building and loan contract within the purview of our law, and that plaintiff was not entitled to exercise the rights, powers, and privileges of a building and loan association under the laws of this state.

Error from District Court, Oklahoma County; Jas. R. Tolbert, Assigned Judge.

Action by the Aetna Building & Loan Association against L. M. Holt and E. I. Holt to recover upon a certain promissory note and to foreclose a real estate mortgage upon land in Oklahoma County. From a judgment for plaintiff, defendants bring error, and plaintiff brings cross-appeal. Reversed, with directions.

Wright & Blinn, Ferry, Doran & Dean, John S. Dean, John D. Rogers, and Ames, Chambers, Lowe & Richardson, for plaintiffs in error.

William P. Harper, for defendant in error.

Fred G. Dennis, State Bank Com'r, S. P. Freeling, Atty. Gen., and William H. Zwick, Asst. Atty. Gen., amici curiae.

RAINEY, C. J. The Aetna Building & Loan Association, a corporation of the state of Kansas, hereinafter referred to as "plaintiff," sued L. M. Holt and E. I. Holt, hereinafter referred to as "defendants," in the district court of Oklahoma county, to recover upon a promissory note in the sum of $3,200 and to foreclose a real estate mortgage upon land in that county. Defendants pleaded that the contract was usurious and prayed for judgment against the plaintiff for the amount that the penalties alleged exceeded the claim of the plaintiff. Trial was had to the court without a jury, and judgment was entered for the plaintiff for $2,449.39, with interest thereon at ten per cent. and $25 attorney's fees. Just how the court treated the payments made, or upon what basis credits were allowed the defendants, is not clear. Defendants appealed, seeking to have twice the whole amount of interest contracted for adjudged against the plaintiff. The plaintiff brought a cross-appeal seeking to recover the full amount of the note and interest, less the value, as computed by it, of certain stock subscribed for by defendants as a condition to the loan made by plaintiff and assigned to plaintiff as collateral for the loan.

It appears that, Lucy M. Holt and E. I. Holt, her husband, desiring to build a home on certain lots in Oklahoma City, the former applied through a local agent to plaintiff for a loan of $3,200. As a condition precedent to the loan she was required to subscribe for seven shares of stock of plaintiff's corporation, denominated installment stock, in the sum of $500 each, payable in monthly payments of $17.50, which stock she was required to assign to the plaintiff as collateral. The loan was further secured by a real estate mortgage upon the lots. The note given by the defendants purports to bear interest at ten per cent. per annum, payable monthly, and is as follows:

"$3,200.00.  First Mortgage Real Estate Note, "No. 1874.

"For value received, we do hereby promise to pay to the Aetna Building and Loan Association, of Topeka, Kansas, on or before ten years after date Thirty-two Hundred Dollars, with interest thereon from date thereof, in monthly installments of Twenty-six and 67/100 Dollars, also monthly dues on seven shares of stock in the sum of Seventeen and 50/100 Dollars, both interest and dues payable on the 5th day of each and every month until sufficient assets accumulate to pay each share-holder five hundred dollars per share for every share held by him, in accordance with the by-laws of said association, and in case of default in the payment of interest or dues or any part thereof, at the stated times, or failure to comply with any of the conditions or agreements contained in the first mortgage on real estate given to secure the payment thereon, then this note shall immediately become due and payable at the option of the legal holder thereof, and shall after such default bear ten per cent. interest per annum, and if collected by a suit, an attorney fee of Twenty-five Dollars may be attached as costs in said case.

"Dated at Oklahoma City, Oklahoma, on the 8th day of August, 1911.

"Lucie M. Holt,<br>"E. I. Holt."

Plaintiff deducted from the amount advanced to the defendants the sum of $98.25, a part of which was for a membership fee. Defendants paid interest on the note in the sum of $241.46, and stock installments in the sum of $157.50. Plaintiff also claimed $42.42, with interest thereon, on account of insurance paid on the mortgaged property.

The plaintiff corporation was organized as a building and loan association under the

laws of the state of Kansas, and has secured a certificate of authority from the State Bank Commissioner to transact business in this state, as required by section 1517, Comp. Laws 1909 (art. 8, Rev. Laws 1910). We will consider the contract as an Oklahoma contract, since the laws of Kansas were not pleaded or proved.

The by-laws of the plaintiff corporation provide for making loans without premiums and without bids, and bids were not received, nor premiums charged on this loan.

The plaintiff corporation cannot exercise any greater or different rights, powers, or privileges than are conferred upon similar domestic corporations. The rule of comity does not require that foreign corporations be allowed to enforce contracts in conflict with the laws of this state, or the enforcement of which would give to the citizens of another state an advantage which a resident does not have. Section 44, art. 9, Constitution; Midland Savings & Loan Co. v. Deaton, 57 Okla. 622, 157 Pac. 285; Midland Savings & Loan Co. v. Summers, 58 Okla. 641, 160 Pac. 488; Midland Savings & Loan Co. v. Nicoll, 76 Okla. 27, 183 Pac. 731; Washington National Building, Loan & Investment Association v. Stanley, 38 Ore. 319, 63 Pac. 489, 58 L. R. A. 816; Falls v. United States Saving, Loan & Building Company, 97 Ala. 417, 13 So. 25, 24 L. R. A. 174, 38 A. S. R. 194; Rhodes v. Missouri Savings & Loan Co., 173 Ill. 621, 50 N. E. 998, 42 L. R. A. 93.

Defendants contend that plaintiff is not a building and loan association within the purview of the laws of this state, and that the transaction between plaintiff and defendants was a mere lending and borrowing of money, subject to the laws governing such transactions. It is urged by defendants that the essence of a building and loan association under the laws of this state is mutuality, and that a failure of mutuality or of the stockholders to share alike destroys the character of a building and loan association.

The building and loan association laws in effect at the time the contract was made are found in Comp. Laws 1909, art. 14, secs. 1487-1532, both inclusive. Section 1488 provides:

"The capital stock of any corporation created by virtue of this act shall at no time consist of more than two thousand five hundred shares, of two hundred dollars each, or five thousand shares of one hundred dollars each, the installments on which stock are to be paid at such time and place as the by-laws shall appoint, no periodical payment to be made exceeding two dollars on each share. Every share of stock shall be subject to a lien for the payment of unpaid installments and other charges incurred thereon, under the provisions of the charter and by laws, and the by-laws may prescribe the form and manner of enforcing such lien. New shares of stock may be issued in lieu of the shares withdrawn or forfeited. The stock may be issued in one or more successive series, in such amount as the board of directors or stockholders may determine, and any stockholder wishing to withdraw from the said corporation shall have power to do so by giving thirty days' notice of his or her intention to withdraw, when he or she shall be entitled to receive the amount paid in by him or her, and such proportion of the profits as the by-laws may determine, less all fines and other charges; provided, that at no time shall more than one-half of the funds in the treasury of the corporation be applicable to the demands of withdrawing stockholders without the consent of the board of directors, and that no stockholder shall be entitled to withdraw whose stock is held in pledge for security. * * * "

A building and loan association is an organizaton created "for the purpose of accumulating a fund by the monthly subscription of savings of its members to assist them in building or purchasing for themselves dwellings or real estate by loaning to them the requisite money from the funds of the association upon good security." 2 Am. & E. Enc. 604; Rhodes v. Missouri Savings & Loan Co., supra. To secure the benefits of the law pertaining to building and loan associations, it must be shown that the business conducted is in keeping with the aims and purposes of such assocations as defined by the laws of this state. It must be apparent that the association claiming the benefits of the building and loan association laws was formed and is being maintained for the purpose of enabling the members thereof to provide a fund by means of small periodical payments which can be loaned to members upon advantageous terms for the purpose of enabling them to become home-owners, and thus encourage thrift and economy, and thereby promote good citizenship. Midland Savings & Loan Co. v. Nicoll, supra. The members of these associations are presumed to be people of limited means, who are unable to borrow money by the usual and ordinary methods, and the underlying idea is to accommodate the poorer and less fortunate members of society by permitting them to make payments of small sums out of their current wages, and thus obtain the means of owning modest homes. Such associations were usually local in their operations, and were supposed to be prudently and economically managed, and when so organized and managed were productive of industry and frugality upon the part of the members, and were entitled to the confidence of the classes of persons for whose benefit they were organized. Midland Sav-

ings & Loan Co. v. Nicoll, supra; 9 Corpus Juris, 921; Endlich on Building and Loan Associations, 2nd Ed.

By section 1511, Comp. Laws 1909, in effect at the time this contract was made, these associations were granted certain exemptions for the reasons, as stated in said laws, that such associations were aggregations of laborers, mechanics, workingmen, workingwomen, and tradesmen, who start without any paid up capital and pay in on their stock only small weekly or monthly assessments, which assessments are immediately loaned to one of the members of the association for the purpose of building a home for such member.

The plan and purpose of the organization contemplates mutuality, and that the stockholders share, and share alike, in the benefits and profits as well as the losses of the association. The corporation has no power to issue stock that will give the holders thereof a preference over the other stockholders, unless empowered to do so by law. 9 Corpus Juris, 936; King v. International Bldg., etc., Union, 170 Ill. 135, 48 N. E. 677.

Under our law, as it then existed, a building and loan association was bound to treat its members equally, and any contract in contravention of the mutuality of the company was ultra vires and void. Thompson on Bldg. and Loan Ass'ns (2nd Ed.) sec. 314; Wierman v. International Bldg., etc., Union, 67 Ill. App. 550; Rhodes v. Missouri B. & L. Ass'n, supra.

"The building association idea implies absolute co-operation. The theory, as first understood and practiced, was that the common fund should be made up by all the members upon a common ground. The ownership of this fund was absolutely in the members according to the amount of their shares of stock. Payments into this common fund were made at the same time and upon the same number of shares in the same amounts by all the members; the fund, when at a divisible size as fixed by the charter of the association, was then divided according to the claims of the respective members based upon their shareholdings. Great simplicity and absolute mutuality were the strong characteristics of the scheme." Thompson on Bldg. and Loan Ass'ns (2nd Ed.) sec. 124.

See, also, 2nd Ed., sec. 129; Endlich on Bldg. and Loan Associations, secs. 39 and 119.

It seems clear that under the laws of this state, as they existed at the time of the transactions herein involved, mutuality was required, and that the borrowing members were entitled to share equally in the profits with the nonborrowing members, and they could not be required to bear more than their proportionate amount of the losses and expenses of the association.

With the foregoing in mind, let us examine the facts in the present case. Membership in the association was open to any person, firm, or corporation making proper application for the amount of stock desired, and paying an entrance fee of $2.50 per share. The authorized capital stock was $20,000,000, divided into 40,000 shares of $500 each, and classified as installment, prepaid, dividend, and deposit stock. Installment stock was that sold to the borrowers and put up as collateral for loans. It was divided into shares of a par value of $500 each, designated as "A", "C", and "D", and sold on monthly payments of $2.50 per share for 119 months, $4 per share for 88 months, and $5 per share for 74 months, respectively. The other classes of stock were purely investment stock. Under the by-laws, deposit stock was issued to suit the convenience of the depositor. Section 3, art. 3, of the by-laws of the association provided that when dividends were declared on deposit stock, a sum equal to 50 per cent. of the earnings of all money paid on such shares should be placed to their credit, provided that the amount so credited should not exceed five per cent. per annum. It was further provided that "stockholders may withdraw their deposit shares at any time, and may receive all money paid on their shares, with five per cent. dividends as herein provided." Dividend shares were issued on the payment of $500 per share, or fractional part thereof and holders of these shares were entitled to receive 60 per cent. of all the earnings on the amount invested in such shares, provided the interest so paid and credited should not exceed six per cent. per annum. The by-laws further provided that "dividend shares can be withdrawn after one year from date of issue and 60 days' written notice to the secretary, and the shareholder shall receive the full amount paid for such stock, with interest to date of withdrawal; provided, that such stock may be retired and paid off whenever the board of directors may deem it to the interests of the association to do so, the same as though voluntarily withdrawn." Full paid deposit stock was issued in certificates of $50 or any multiple thereof on payment of 50 per cent. of the par value of the same, and was payable in full ten years from date of issue without interest; "provided, the earnings shall not exceed the per cent. of profit credited to other classes of stock." Section 13, art. 3, of the by-laws reads:

"All profits arising from the shareholders' payments shall be summed up as a whole in the months of January and July of each year, and out of such profits shall be paid all

interest due and payable on prepaid, deposit and dividend shares, taxes on the assessed stock of the association and losses, if any. The board of directors shall then declare the remainder of such profits as dividends to all installment stock pro rata to the book value thereof, and all dividends so declared shall be credited to such stock on the books of the association and shall earn dividends thereafter the same as cash payments on the stock."

From the foregoing it clearly appears that the plaintiff was not a building and loan association as contemplated by the laws of Oklahoma in existence at the time the contract was made. The stockholders were not confined to those persons mentioned in the laws of the state and contemplated by the laws in force at the time of the contract. The stock was not necessarily purchased by those of limited means, but could be subscribed for by capitalists, corporations, or by any person desiring attractive interest on his investments, as well as by those compelled to subscribe for it in order to secure a loan. There was a want of mutuality between the borrowing stockholders and the others in that the borrowing members—installment stockholders—were not entitled to any profits until after "all interest due and payable on prepaid, deposit, and dividend shares, taxes on the assessed stock of the association and losses, if any," were paid, whereas other stockholders were entitled to interest on their stock out of its earnings without any deduction for taxes and losses.

Moreover, loans were not let by bidding, as provided by section 1490, Comp. Laws 1909. Midland Sav. & Loan Co. v. Deaton, supra; Midland Sav. & Loan Co. v. Summers et al., supra. Nor was there any limit to the amount of stock which an individual might acquire. Midland Sav. & Loan Co. v. Nicoll, supra.

The foregoing discussion has reference to the building and loan association laws as they existed at the time of the transaction herein involved. Since that time material amendments have been made to the law. See chap. 15, art. 7, and art. 8, Rev. Laws 1910; chapter 200, p. 445, Sess. Laws 1913; chapter 238, p. 616, Sess. Laws 1913; chapter 283, p. 542, Sess. Laws 1915.

Since plaintiff was not a building and loan association under our law in effect at the time the contract was made, and therefore was not entitled to the rights and privileges pertaining to such associations, what was the status of the loan? It cannot be worse than that of an ordinary loan, and, considering the uncertainty of the law and the decisions relating thereto, it ought to have whatever security the law can throw around

it as a loan and not be subjected to the severe penalties imposed on those who wantonly and flagrantly violate the law. Aetna Bldg. & Loan Ass'n v. Rouch, 32 Okla. 735, 124 Pac. 24; Midland Sav. & Loan Co. v. Deaton, supra; Midland Sav. & Loan Co. v. Summers et al., supra.

The rate of interest stipulated in the note was ten per cent. per annum, but the entire contract, being invalid under our view, stands as if the loan had been made without reference to interest, in which case not the maximum contract rate, but the legal rate of six per cent. per annum, is the rate to be charged. Section 2, art. 14 (313, Williams' Ed.), Constitution; 15 Ruling Case Law, 21; Washington, etc., Co. v. Stanley, supra; Ewell v. Daggs, 108 U. S. 143, 27 L. Ed. 682.

It is urged by the defendants that the contract is usurious, and that therefore the plaintiff should forfeit twice the amount of the interest contracted for; but the contract itself does not, on its face, purport to be in excess of the contract rate allowed by law. It was made when sections 1493 and 1523, Comp. Laws 1909, were in effect, and those laws attempted to permit building and loan associations to make charges not permissible by ordinary loan companies.

Therefore, in the absence of evidence to impute an intent to collect greater than the legal rate of interest, such intent will not be implied. Aetna Bldg. & Loan Ass'n v. Rouch, supra; Midland Sav. & Loan Co. v. Deaton, supra; Midland Sav. & Loan Co. v. Summers, supra; Washington, etc., Co. v. Stanley, supra. While we hold that the contract of the plaintiff was not strictly a building and loan contract under the laws in effect at the time of this transaction, there is nothing in the record to show that it did not in good faith contract believing that its contract was valid. And in view of the sections of the Compiled Laws of 1909 cited, supra, an intent to charge usury will not, therefore, be implied.

Having determined that plaintiff's contract is not strictly a building and loan contract, dues upon stock, fines, membership fees, and all other payments made, except interest actually due and the necessary and statutory fees for examining the title and preparing the abstract, must be credited on the loan. Midland Sav. & Loan Co. v. Deaton, supra; Midland Sav. & Loan Co. v. Summers, supra; Meroney v. Atlanta Bldg. & Loan Ass'n, supra.

It is urged that when these items are applied on the loan the interest rate therefor becomes greater than ten per cent., and the contract therefore becomes usurious. Section 2, chap. 119, Sess. Laws 1910, effective at the time this transaction was entered into, pro-

vides a forfeiture of twice the amount of the usurious interest charged. The position of the defendants is stated by their counsel in their brief as follows:

"The contract unequivocally calls for and requires defendants to pay 200 monthly installments on the stock in order to mature it and entitle them to a discharge of their obligation, and requires monthly payments of 200 installments of interest in the aggregate sum of $5,334. The defendants are entitled to double this sum, amounting to $10,668. Crediting the principal debt with the amount retained by plaintiff, $59.50, and the amount paid on the stock $157.50, leaves a principal sum of $3,083. Deducting this from the forfeiture leaves the defendants entitled to a judgment against the plaintiffs in excess of the amount due plaintiff in the sum of $7,585."

While the penalty to be imposed by usury is a matter for legislative enactment and not for judicial determination, the injustice of permitting a recovery of the amount urged, in addition to the sums already received on the loan, is so manifest that a forfeiture will not be implied from any mere irregularity of the transaction. In view of the uncertainty of the building and loan law at the time of this transaction, a corrupt intent must be shown before the penalty can be imposed; and, regardless of what the law may be where persons enter into a transaction which they both understand at the time to be a mere loan, the intent in a transaction which both parties enter into in good faith with the belief that the transaction is in fact a building and loan transaction is important, and the penalties of usury will not be imposed in the absence of a showing of corrupt intent to charge usury. It has been the holding of this court that in order for a contract to be usurious there must be in fact an excessive charge and such charge must be made with the unlawful and corrupt intent to take interest in excess of the lawful rate. Garland et al. v. Union Trust Co. et al., 49 Okla. 654, 154 Pac. 676; Deming Investment Co. v. Grigsby, 65 Oklahoma, 163 Pac. 530. And, while the holding in Midland Saving & Loan Company v. Tuohy, 69 Oklahoma, 170 Pac. 244, that whenever the usurious character of the transaction is revealed on the face of the instrument the unlawful intent to charge or receive an illegal rate of interest for the money loaned will be inferred from the instrument itself, is correct, in the absence of proof to the contrary, it is also fundamental that where the contract is apparently fair on its face and the interest, as disclosed by the terms of the instrument sued on, is within the legal limit, but the claim is made that usury was in fact retained, and that such usurious charge is evidenced by other collateral instruments or by some agreement or device intended as a cloak for such usurious transaction, as, for instance, the charging of premiums for stock, it then becomes a question of fact as to whether such sums were in, truth and in fact reserved and charged as interest or for the collection of interest thereon, or as a device to secure an illegal rate of interest, and whether, if so charged, they, or the interest thereon, together with the amount of interest reserved in the note, would amount to usury, and in such case the intent of the parties at the time the contract was entered into is a question to be determined from all the facts and circumstances in the case. Garland et al. v. Union Trust Co., supra; Tyler on Usury, pp. 103-105.

Usury statutes that work a forfeiture are penal. Stockyards State Bank v. Johnston, 52 Okla. 32, 152 Pac. 585; Ewell v. Daggs, supra; Poppleton v. Nelson, 12 Ore. 349, 7 Pac. 492; 39 Cyc. 910, and cases cited; Tyler on Usury, p. 374. Such statutes must be strictly construed, and before one can recover the penalty therein imposed he must state specifically every fact to bring himself strictly within all their terms. Buttner v. Western Union Tel. Co., 2 Okla. 234, 37 Pac. 1087.

Where transactions are penal or criminal in their nature, the intent of the parties is, in the absence of something to indicate the contrary, material.

In Tyler on Usury, pages 109, 110, it is said:

"The question of usury is always put upon the intention and purpose of the parties; and in order to make a contract usurious, it must be apparent, either upon the face of it or by evidence, that the intention of the parties in the creation of it was, by means of shift or device, to take more than legal interest for the loan or forbearance of money. It depends upon the intent of the parties, and they may show anything to make it appear that there was no corrupt agreement. The authorities, both ancient and modern, speak a language on this point too uniform and plain to be mistaken. We cannot know the agreement unless we look at the intention. This is the essence of every contract, as well as of every crime. There must be a criminal intention or there can be no guilt. Upon any other principle the statute against usury would operate as a snare, in which the artful and designing might entrap their neighbors by setting up and establishing usury where none was ever intended. But where a party deliberately and knowingly takes a greater rate of interest than the statute allows, the law fixes the interest and pronounces the transaction usurious. Thus it appears that, in order to constitute usury, there must be (1) a loan, express or implied; (2) an understanding be

tween the parties that the money lent shall or may be returned; (3) that for such loan a greater rate of interest than is allowed by law shall be paid or agreed to be paid, as the case may be; and (4) a corrupt intent to take more than the legal rate for the use of the money loaned. Unless these four things concur in every transaction, it is safe to affirm that no case of usury can be declared; and this may be regarded as a rule universally recognized in all the states."

Whatever may have been the facts in the Tuohy case, supra, the note sued on herein is not on its face usurious. It recites a payment of $26.67 per month, or ten per cent. per annum. The defendants also purchased installment stock for which they were to pay premiums regularly and which stock they pledged as collateral for the loan. The making of the loan without competitive bids and the failure of the plaintiff to sell installment stock to the defendants on the same, or as favorable, terms as stock was sold to other classes of stockholders, under the laws existing at the time of the transaction, made it ultra vires; but these facts, in the absence of an intent to charge more than the legal rate of interest on the money loaned, are not sufficient to fasten on the transaction the penalties of usury. If the contract had been in fact a building and loan contract, it could not consistently be argued, in view of sections 1493 and 1523, Comp. Laws 1909, supra, that the transaction was entered into in bad faith, or with the intent to charge usury; and, while the motive of the plaintiff corporation is a proper subject to be submitted to the jury or to the court trying the case, this court can not presume, in the absence of any finding of corrupt motive or from the facts shown by the record, the plaintiff did not act on the belief that the transaction was entered into in good faith as a building and loan transaction.

The defendants, having given their note in good faith to procure the loan, are morally bound to pay the debt and to return the money actually received with interest at the legal rate. Garvin v. Linton, 62 Ark. 370, 35 S. W. 430.

In this case there has been no finding of usury. The note sued on, on its face, does not show usury. The defense of usury must be made out from the collateral transactions, and while we hold that the transaction is not a building and loan transaction in fact, we are not prepared to say from the facts in the record that the whole transaction was a scheme to collect an illegal rate of interest. The correct rule to be followed in this case is, we think, that laid down in Aetna Building & Loan Association v. Rouch, supra. Proper credits must be given on the note,

and interest should be allowed at the legal rate.

It follows that plaintiff is entitled to judgment for the principal of the note sued on and for insurance money advanced on the property, after allowing credit on said sums for payments made on stock purchased and for entrance fees collected when the loan was made, with six per cent. interest per annum from the time the money was received by defendants or advanced for them. This cause is, therefore, reversed, with directions to the trial court to render judgment accordingly.

HARRISON, KANE, PITCHFORD, JOHNSON, McNEILL, and BAILEY, JJ., concur.